[No. 36513. Department Two. June 27, 1963.]

THE CITY OF SEATTLE, *Respondent,* v. CHARLES A. NAVE, *Appellant.*\*

C. A. Nave, pro se.

A. C. Van Soelen and James G. Leach, for respondent.

DONWORTH, J.—Appellant, Charles A. Nave, was charged with the violation of certain provisions of two Seattle city ordinances, described below. He was tried and found guilty in the municipal court of Seattle on both charges. As provided by RCW 35.20.040, appellant appealed to the superior court, where, in a trial de novo before the court sitting without a jury, appellant was again convicted. He was

\* Reported in 383 P. (2d) 491.

sentenced to pay a fine of $15 on the first charge and a fine of $10 on the second charge (the latter being suspended). He has now appealed to this court from the sentences imposed by the superior court. Before discussing the specific charges, the pertinent facts will be set forth.

Roosevelt Way is an arterial in north Seattle which is a one-way street for southbound traffic. From N.E. 71st Street to N.E. 45th Street are curb signs along the far-right lane reading: "CURB LANE FOR TRANSIT AND RIGHT TURN ONLY 7-9 A M."

At 7:45 a. m. on December 20, 1961, a motorcycle patrolman for the Seattle Police Department was parked in a lot in the 5900 block on Roosevelt Way. He observed appellant, whose vehicle was then parallel to the 6200 block, driving south in the far-right lane. When appellant drove past him, the patrolman started following appellant's vehicle with the intention of citing appellant for traveling straight ahead in the lane reserved for right-turning vehicles, in violation of the traffic ordinance (§ 65-C of Ordinance No. 80998). Before the patrolman could stop him, appellant turned right onto N.E. 55th Street and stopped in front of his home, which is located just off Roosevelt Way.

The following patrolman stopped his motorcycle and approached appellant, who got out of his automobile. Appellant, upon request, handed his driver's license to the patrolman; at the same time, he inquired as to the reason for the patrolman's action. Appellant was told that he had committed a traffic violation by going straight through in the right-turn lane. He protested that he had not committed such a violation. The patrolman insisted to the contrary and started to write out a citation.

We pause at this point in the recitation of the facts to discuss the first charge.

Appellant is charged with failing to comply with restrictive signs requiring him to make a right turn while operating a motor vehicle, in violation of Seattle City Ordinance No. 80998, § 65-C. This ordinance reads as follows:

"(c) Official signs may be erected directing slow moving or any particular class of traffic to be operated in the desig-

nated lane, or allocating specific lanes to traffic moving in the same direction, and it shall be unlawful for any person operating a vehicle upon the public highways of this city to disobey the directions of any such sign or signs."[1]

The curb sign in question reads: "CURB LANE FOR TRANSIT AND RIGHT TURN ONLY 7-9 A M." The legend on the pavement is "RIGHT TURN LANE." The position of the city is that the curb sign designates that the far-right lane between 7 a.m. and 9 a.m. is reserved for a class of traffic that (except for municipal busses) must turn right at the first intersection after getting in that lane, and that if a driver does not turn right at the first intersection, he is in violation of the above quoted ordinance. The city contends, however, that the police department has an enforcement policy that a person will not be given a citation for driving in the right-turn lane until he has gone past three intersections.

Deputy Chief Robert Green of the Seattle Police Department testified that the tolerance policy existed because it was sometimes impossible for a motorist entering Roosevelt Way to move from the curb lane into the adjoining one because of the high flow of traffic. He also observed that the police found that when a motorist sees an officer assume a position behind him, he makes a right turn, because he knows that he should not be in that lane. The city, in its brief, also points out that the public was informed, through the newspapers, of the purpose of the signs in question.

■ It is not the tolerance policy of the police department, the declared purpose of the signs as reported in the newspapers, nor the apprehension of motorists in being followed by motorcycle patrolmen that determines whether appellant violated the city ordinance, but only whether he failed to comply with the directions of the posted signs. We pose only one question: Does the sign direct the motorist that he must turn right at the first intersection he approaches? The answer is that it does not. Appellant followed the di-

---

[1] The language of this ordinance was taken from Seattle City Code 21.28.310(c), which is now omitted from the present code because of the repeal of Seattle City Ordinance No. 80998 by Seattle City Ordinance No. 9190, March 11, 1963.

rections of the sign when he drove in the right-turn lane and did, in fact, turn right.

Respondent contends that, since the lane is not intended for through traffic, an interpretation of the signs that allows a motorist to travel beyond the first intersection before turning right presents problems of enforcement. We fail to find that there is a question of interpretation presented. If the city wishes to erect signs that direct the motorist to turn right at the first intersection after entering the far-right lane, it is free to do so. However, the sign involved in this case is completely inadequate for that purpose. Since the sign did not direct appellant to turn right at the first inter-section, the trial court was in error in finding appellant guilty on the first count.

We shall now continue with the factual sequence of events which led to the second charge against appellant (resisting an officer in violation of § 50 of Seattle City Ordinance No. 16046).

In the course of writing out the citation, the patrolman asked appellant to state his occupation, the form of the citation furnished the officer having a space labeled "occu-pation." Appellant refused to answer, saying that his occupation had nothing to do with the traffic violation. At this juncture, both parties were adamant in their positions. Appellant insisted that the patrolman had no right to de-mand what his occupation was, and the patrolman was equally insistent that he did have such a right. After this stalemate had continued for some time, appellant finally seized his driver's license from the officer and started to walk toward his house. The patrolman then demanded that appellant return the license to him. When appellant ignored the officer's demand, he was arrested and taken to the police station.

While the pertinent facts are described above, we have not described in detail the conduct of the officer nor of the appellant. They both completely lost their sense of reason

and created a ludicrous scene in the street, which attracted the attention of the neighbors.[2]

The second charge against appellant is that he "did wilfully and unlawfully resist and oppose a member of the Police Department of the City of Seattle, in the discharge of his official duty," in violation of Seattle City Ordinance No. 16046, § 50 (Seattle Code 12.11.460).

It is not contended that merely being unco-operative, *i.e.*, the refusal of appellant to state his occupation, constituted the offense charged. Respondent's position is that the gist of the offense is appellant's conduct in taking his driver's license away from the officer and refusing to return it when requested.

The officer had no right to retain possession of appellant's driver's license longer than was reasonably necessary to enable him to take therefrom the pertinent information needed to make out the citation. RCW 46.56.190 makes it unlawful for a person operating a motor vehicle to refuse to permit an officer to take his vehicle operator's license "for the purpose of examination thereof." Appellant did, in the first instance, give his driver's license to the patrolman. At the trial, the city did not attempt to prove that the patrolman had not made a sufficient examination of appellant's license before appellant regained possession of it. The patrolman, upon cross-examination by appellant, admitted that he had already written on the citation the information he needed from the license. It was then his duty to return the license to appellant.

While the patrolman was undoubtedly disturbed by having the driver's license forcibly taken away from him, we are of the opinion that appellant's action in retaking his license and refusing to again give the license to the officer

---

[2]After the patrolman placed appellant under arrest, he called for another motorcycle patrolman to assist him. The latter, when he arrived, ordered appellant's neighbor back into his house. Before appellant was taken to the police station, his car, which was in his driveway, but partially on the sidewalk, was towed away and impounded even though appellant requested that he be allowed to drive or coast the car into his garage, which required only the release of the hand brake.

did not constitute resisting the officer in the discharge of his duty within the purview of § 50 of Ordinance No. 16046, and that the trial court was in error in so holding.

The judgment and sentence is reversed on both counts and the city's complaint against appellant is hereby ordered to be dismissed.

OTT, C. J., FINLEY, WEAVER, and HAMILTON, JJ., concur.